781 So.2d 1223 (2001)
STATE in the Interest of S.M.W., C.D.W., C.N.W., and E.S.W.
No. 2000-CJ-3277.
Supreme Court of Louisiana.
February 21, 2001.
*1224 Jacquelyne J. Heinen, Lake Charles, Counsel for Applicant.
Douglas L. Hebert, Jr., Kinder, Herbert T. Nesom, Judi Frances Abrusley, Kenneth R. Rush, Oakdale, Counsel for Respondent.
VICTORY, J.[*]
We granted this writ to determine whether the court of appeal erred in reversing the trial court's order terminating the parental rights of Tina Walters, the mother of S.M.W., C.D.W., C.N.W., and E.S.W. After reviewing the record and the applicable law, we reverse the judgment of the court of appeal and reinstate the judgment of the trial court, terminating Tina Walters' parental rights.

FACTS AND PROCEDURAL HISTORY
Tina Walters is the mother of two minor daughters, S.M.W., born on August 7, 1985, and C.N.W., born on July 1, 1988, and two minor sons, C.D.W., born on August 26, 1986, and E.S.W., born on October 1, 1990. Kevin Melder is the father of S.M.W., C.D.W., and C.N.W. Timothy Johnson is the father of E.S.W. Tina Walters has never been married.
On December 15, 1995, the Office of Community Services ("OCS") in Allen Parish received a report of alleged child abuse/neglect concerning Ms. Walters' children. The report stated that E.S.W. was observed on December 14, 1995, with several abusive bruises on his buttocks, as well as several other marks that appeared to be cigarette burns and that were consistent with burns E.S.W. had several years earlier.[1] No charges were ever filed as a result of this alleged abuse. The report further stated that Ms. Walters was incarcerated and no one was at her home to care for her children. On December 18, 1995, the neighbors, friends and relatives who were caring for the children indicated that they could no longer do so and efforts to find other willing relatives failed. Therefore, on December 19, 1995, the Juvenile Court issued an Oral Instanter Order taking the children into the State's custody and on December 21, 1995, signed *1225 a judgment finding that there were reasonable grounds to believe the children were in need of care, abused, or neglected and that it was in the best interest of the children to place them in the temporary custody of the State.
On December 21, 1995, Ms. Walters' bond was posted and she was released from jail. However, at the 72-hour hearing, the judge determined that Ms. Walters' legal problems were not resolved and that it would be in the best interests of the children for them to remain in the State's custody until her legal problems were resolved. While Ms. Walters was out on bond, she was arrested for theft and incarcerated again.
On January 24, 1996, a hearing was held and the children were adjudicated children in need of care pursuant to La. Ch.Code art. 666.[2] On February 5, 1996, a psychological examination was conducted on Ms. Walters and her four children by Dr. Sam Williams, in an effort to determine what was necessary in order to reunite the family. Based on these evaluations, Dr. Williams found that "[a]lthough [Ms. Walters] has some affection for her children, she is likely to have considerable difficulty providing a safe environment and meeting their emotional and material needs." "Therefore," he found, "she is at considerable risk to neglect or passively abuse her children." He recommended that each of the children receive some form of psychotherapy, that Ms. Williams receive extensive education and therapy to assist her in developing better parenting skills, random drug testing to help her abstain from substance abuse, and that any visitation be supervised.
On May 7, 1996, Ms. Walters pled guilty to twenty-four counts of criminal charges. The court gave her a five-year suspended sentence with probation, under which she was to participate in, and complete, a drug outreach program, submit to random drug testing, and pay restitution. On May 26, 1996, based on the recommendation of OCS, the trial court granted continued foster care for the children. The OCS based their recommendation on the children's reports of drug use and neglect by Ms. Walters, the lack of stability in Ms. Walters' housing and employment, and the positive changes in the children's lives since they had been in foster care.
Beginning on January 16, 1996, OCS formulated a series of case plans, each of which lasted for approximately six months. Each case plan had a series of goals for the mother and children to meet and a report on the mother's compliance with the previous case plan. The first two case plans, dated January 16, 1996, and June 4, 1996, were formulated based on the information provided by Dr. Williams with the goal of parental reunification with the children. OCS reported on the June 4, 1996 case plan that although Ms. Walters had made some progress toward achieving her first case plan, more work was needed in meeting the goal of family reunification. Specifically, OCS reported that Ms. Walters had three different jobs within the last three months, had delayed informing *1226 her case worker of changes in her employment and housing, and did not keep her appointments for drug evaluation.
Dr. Williams reported minimal progress of Ms. Walters on her therapy update of November 6, 1996. He therefore recommended that the children not be returned to her since her instability continued in several key areas, namely, residential, employment, relationships with men, and marijuana use. On December 3, 1996, OCS reported that Ms. Walters had made very little progress toward the achievement of her case plan, had four different jobs in the last six months and was currently unemployed, lived at four different addresses during the last six months and currently did not have her own home, tested positive for marijuana twice (on July 18, 1996, and September 6, 1996), had delayed informing her case worker of changes, and that her compliance with her probation was limited. Further, the Court was notified on September 13, 1996, that Ms. Walters was unsuccessfully discharged from her required substance abuse treatment due to her failure to make minimal progress. In all other respects, she had complied with the case plans.
The goal of the December 3, 1996, case plan was changed to placement of the children with a relative. Six months later, OCS reported that Ms. Walters had been employed at a restaurant for three months but was fired for misconduct and currently had two part-time jobs, that she had lived with three different sets of friends from December to April when she moved into a trailer she had rented in March, that she had tested negative for marijuana, and that she had delayed informing her caseworker of changes. In all other respects, she had complied with the case plan. All reports indicated that the children's academic performance and emotional well-being were improving since they had been in foster care.
The goal of the June 3, 1997, case plan was changed to adoption for the children. However, on August 27, 1997, and September 12, 1997, respectively, at the urging of the District Attorney's Office, C.D.W. and S.M.W. were placed with Ms. Walters for a trial placement. OCS alleges that the District Attorney and the Court felt that Ms. Walters should be given a chance to show she could safely parent her children before seeking termination of rights, and, if a trial placement of the two older children was successful, with the help of intensive in-home services, the two younger children would follow.
On October 3, 1997, an affidavit, motion, and order for hearing to revoke Ms. Walters' probation was filed on the grounds that Ms. Walters had admitted using marijuana and had tested positive on several occasions, had failed to make restitution, and had failed to pay her probation supervision fees. The hearing was scheduled for December 16, 1997.
In October and November of 1997, OCS reported that C.D.S. was having behavioral problems at school, and Ms. Walters was not giving him the medication prescribed for these problems on a regular basis. Ms. Walters was enrolled in GED classes and was to attend classes two nights per week. She was further ordered to inform OCS of any incident concerning S.M.W. or C.D.W.
On April 2, 1998, OCS issued a report summarizing recent activities. It stated that on February 19, 1998, the Educational Treatment Council, Inc., Family Prevention Program (the "ETC") began providing in-home services to Ms. Walters to assist her in providing more positive parenting skills, focusing on the safety and supervision of her children. The OCS report indicated that the ETC counselor observed *1227 that Ms. Walters had difficulty understanding her boundaries and roles as a parent and that she seemed immature. C.D.W. told the counselor that Ms. Walters was "using" again and that she would leave the trailer to go to the store and not return until 1:00 or 2:00 in the morning. Further, Ms. Walters had refused to produce a urine sample for a drug screen on March 27, 1998, after the ETC counselor transported Ms. Walters to her probation appointment. Regarding S.M.W., OCS reported that she was in danger of failing school, even though she had been chosen "Student of the Year" while she was in foster care. She told the ETC counselor and her teacher that she was not doing well because she was not receiving any help from her mother at home. Further, S.M.W. was seen unsupervised blocks away from her home at night, even though Ms. Walters was instructed not to allow her to go too far from home without supervision. Regarding C.D.W., he was in danger of failing and had received four suspensions for fighting and talking back to the teacher. Further, on March 25, 1998, OCS learned for the first time that on January 15, 1998, the Calcasieu Parish District Attorney's Office filed a petition to have C.D.W. declared a delinquent and that on March 9, 1998, C.D.W. was declared a delinquent and placed on temporary probation on charges of criminal damage to property. This incident occurred between August 15-17, 1997, during a visitation with Ms. Walters, but before he was temporarily placed in her home, at which time Ms. Walters bought C.D.W. a BB gun and he used it to shoot out some windows in a vacant house across the street from his mother's trailer. Ms. Walters did not report this incident to OCS until March 26, 1998, after being instructed to do so by C.D.W.'s probation officer.
Additionally, in March 1998, the children and their mother were psychologically evaluated by Dr. Ann Menou in order to assess their present status. S.M.W. and C.D.W. described incidents to Dr. Menou which revealed their mother was lax in supervising them and in encouraging and assisting them with school work, and that their mother's present boyfriend was physical with them and their mother. C.D.W. told her that he wished there was less "doing drugs" at their house and described an instance in which their mother left to go to the store and did not return until the early morning hours, causing him great concern. C.N.W. described similar instances that occurred during her weekend visits. E.S.W. seemed to be faring well and was optimistic about returning to live with his mother.
A review hearing was held on April 15, 1998, and S.M.W. and C.D.W. were returned to foster care with the same family, with Ms. Walters having visitation rights to her children from 4:00 to 6:00 p.m. at the Civic Center in Lake Charles, Louisiana, once per month. Attorney Ray Rush was appointed to represent Ms. Walters. C.D.W. had been placed in Boys Village as a result of his behavioral problems.
The case plans of December 9, 1997; July 7, 1998; and December 20, 1998, all were formulated with the continued goal of adoption. The compliance reports indicate that Ms. Walters had maintained the same housing since July 1997 and was continuously employed. However, she delayed informing her caseworker of changes or problems and on more than one occasion had refused to submit to a drug screen.
On July 20, 1998, Ms. Walters filed a Rule for Contempt and Termination of the State's Custody, or in the alternative, increased visitation privileges, and a Rule of Psychological Evaluations of the children. On July 31, 1998, a hearing was held and the court substantially increased visitation *1228 rights. She was granted visitation on the third weekend of every month from Friday to Sunday, and overnight visits on holidays and birthdays. As part of this order, it was ordered that no adult males be present during the visits that no drugs or alcohol be present during the visits and that Ms. Walters submit to voluntary random drug testing. On October 14, 1998, the court appointed an independent psychologist, Dr. David S. Post, to evaluate the children and issue an opinion on whether increased visitation would be in the best interests of the children and whether the family could be reunited.
On October 16, 1998, Ms. Walters filed another Rule for Increased Visitation Privileges. On November 24, 1998, OCS filed a Petition for Certification for Adoption and Termination of Parental Rights. On January 27, 1999, a hearing was held on the Rule for Increased Visitation Privileges and extensive testimony was received from ten different witnesses, including the four children. Ms. Walters' probation officer testified that although in 1996 and 1997 her compliance with probation requirements was sporadic, she had become more serious after the revocation hearing in March of 1998, and her last positive drug screen required by probation was in March of 1998. He testified that as soon as she pays her restitution, that her probationary period will be over. C.D.W. and E.S.W. testified while Ms. Walters was in the courtroom. Both testified that they wanted to live with their mother, but that they had seen their mother use drugs once and that her boyfriend "Craig" was present during their visits. C.N.W. and S.M.W. testified after the judge ordered that Ms. Walters sit in his chambers next to a doorway so she could hear without being seen. They testified that they wanted to continue to live with their foster parents, rather than return to live with their mother, but wanted to visit her once a month. S.M.W. testified that she last saw her mother smoke marijuana "last year." C.N.W. testified that "last year" during a visit, she was in the car with her mother and Craig, when Craig stopped at a store and bought some rolling papers and their mother rolled him a joint. She testified that she last saw her mother smoke marijuana three visits ago. Testimony was also presented that Ms. Walters tested positive for marijuana on November 23, 1998, and the results of the drug screen were admitted as a proffer. After the hearing, the court decreased Ms. Walters visitation rights to four hours a month on the first Saturday of each month and four hours for major holidays, with no overnight visits.
On May 21, 1999, the trial on the certification for Adoption and Termination of Parental Rights commenced. It resumed on July 8, 1999, and concluded on July 15, 1999. On September 24, 1999, the trial judge issued a fourteen page judgment terminating the parental rights of Ms. Walters, Mr. Melder, and Mr. Johnson and certifying the Walters children for adoption.
The court considered as "pivotal evidence" the testimony of three expert witnesses, all psychologists in private practice in Lake Charles. Dr. Sam Williams evaluated Ms. Walters and the children between February 1996 and June 1997. He testified that Ms. Walters was self-absorbed, hedonistic, impulsive, and narcissistic. He testified that she did not recognize that she had any parenting problems and that her continuing problems with her relationships with men was having a significant adverse affect on her children. He further testified that he received no information from OCS that Ms. Walters was not complying with her case plans, but he felt that she had made minimal progress in addressing the issues that brought her to *1229 counseling. He testified that her personality disorder was a mental illness that was treatable, but that treatment was very difficult. He had no recommendation as to whether she should eventually be reunited with her family or if she would improve. As to the children, he testified that S.M.W. was concerned for her safety, had a strong desire for nurturing, was needy and insecure and was worried about her mother and thought her mother was unstable. C.N.W. did not feel safe with her mother but felt safe with her foster parents. E.S.W. was very attached to his foster mother, was anxious, insecure, and had an unusual knowledge of drugs. C.D.W. was angry, aggressive, insecure, and had low self-esteem. In Dr. Williams' last report regarding the family on November 6, 1996, he recommended that the children not be returned to her because of her continued instability and marijuana use, poor judgment, and narcissistic and hedonistic lifestyle.
Dr. Menou described Ms. Walters as impulsive, with histrionic and anti-social features. However, she testified that when she first saw the family, in March of 1998, she thought that there was a possibility of reunification of the family in the future. She also began seeing the children for therapy and reported that when overnight visits with Ms. Walters began in July of 1998, all the children began experiencing escalating behavioral difficulties. She testified that she now felt that reunification was a remote possibility because of the children's need for stability, the problems they experienced during weekend visits, and their fears of returning to their mother because of possible abuse and neglect and her inability to care for them. She was also concerned about physical abuse by Ms. Walters' boyfriend and the fact that he remained in the home for visits, even though the court had prohibited that. She therefore believed that the best interests of the children was in terminating Ms. Walters' parental rights.
Dr. Post evaluated Ms. Walters and the children by court order of October 14, 1998. He also reviewed the record of the case and listened to the testimony of the witnesses. He testified that Ms. Walters has a personality disorder, that she is narcissistic, dependent, histrionic, and antisocial, all of which prevent her from parenting her children. He concluded that "Tina's chances to rehabilitate herself are just about nil" and that "the problem here is neglect."
Considering this "pivotal evidence," as well as the testimony at trial, the trial court ruled:
After careful consideration of all the evidence, the Court finds that the state has proven by clear and convincing evidence that the parental rights of Tina Walters to her children ... should be terminated. It is not that Tina Walters does not care for her children, but rather that she is incapable of proper parenting, supervision, and discipline. She cannot provide a safe and stable home for her children. Her pattern of employment and living arrangements has been erratic. She routinely neglected to notify the Office of Community Services about her changes in employment and living arrangements. She has continued to exhibit poor insight and judgment regarding proper care for her children. Unfortunately, she has persistently failed to recognize, and admit, her deficiencies in parenting skills, and she still considers herself, the victim of these deficiencies rather than her children. She was given counseling ... but the net result was minimal progress in her parenting skills.... Significantly, the emotional, academic, and behavioral condition of the children deteriorated *1230 while in her care resulting in the children being returned to foster care ... Despite her announced intentions, she is incapable of doing a better job of parenting than she has done to date. She suffers from a mixed personality disorder, and all the psychologists agree that there is very little chance of improvement, if any exists at all. Reformation sufficient to prevent termination of parental rights requires that the parent demonstrate a substantial change, such as significantly altering or modifying that behavior which served as the basis for, and resulted in the State's removal of the child from the home. State in the Interest of E.G., 95-0018 (La.App. 1 Cir. 6/23/95), 657 So.2d 1094, writ denied, 95-1865 (La.9/1/95), 658 So.2d 1263.
The Court finds that the State has proven by clear and convincing evidence each element of Article 1015(5) of the Children's Code in that (a) at least one year has elapsed since the children were removed from the custody of Tina Walters pursuant to a court order; (b) there has been no substantial parental compliance with the case plans previously filed and approved as necessary for the safe return of the children; and (c) despite earlier intervention, there is no reasonable expectation of significant improvement in the condition or conduct of Tina Walters (and Kevin Melder and Timothy Johnson) in the near future, considering the children's ages and their needs for a stable and permanent home. The Court further finds that Tina Walters has failed to keep the Office of Community Services apprised of her whereabouts and significant changes affecting her ability to comply with the case plan, and she has failed to make substantial improvement in redressing the problems preventing unification and many of the conditions that led to removal of the children still persist. Children's Code Article 1036(C). The lack of any reasonable expectation of significant improvement in the parent's conduct is evidenced by (1) the personality disorder that renders Tina Walters unable or incapable of exercising proper parenting without exposing the children to substantial risk of serious harm based upon expert opinion, and based upon an established pattern of behavior, and (2) her condition and conduct which indicate that she is unable to provide an adequate permanent home for the children based upon expert opinion. Children's Code Article 1036(D). The Court finds that the State made reasonable efforts to reunite the children with their parent, but despite these efforts, reunification would not be in the best interests of the children. [The doctors] are unanimous in stating that reunification would not be in the best interests of the children.
The court of appeal reversed the judgment, finding that the trial court's findings were manifestly erroneous. State in the Interest of S.M.W., C.D.W., C.N.W. and E.S.W., 00-308 (La.App. 3 Cir. 8/9/00), 771 So.2d 160. The court stated in part:
We conclude that the factual findings are manifestly erroneous. We, therefore, conduct a de novo review of the record.
[Ms. Walters] has not demonstrated a pattern of incarceration that makes her unfit to parent her children. The removal of the children stemmed from an isolated instance in which Ms. Walters was unable to render care for them because she was incarcerated and impoverished. That singular event unleashed a flood of State action in the lives of the Walters family. The clear and convincing standard employed in parental termination cases is meant to alleviate the risk that the factfinder will deprive a *1231 parent of the care and custody of his children based solely on a few isolated instances of unusual conduct. See Stanosky, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 [infra]. After her release from jail, Ms. Walters made steady improvements in her parenting and life skills. Both the Department and the trial court discounted the merits of these accomplishments.
. . .
Ms. Walters' alleged mental illnesses are personality traits, such as being self-absorbed and narcissistic, and largely a product of her limited education. These traits do not rise to the level of mental illness commanding a termination of parental right ... we conclude that the evidence does not support the judgment that Ms. Walters suffers from a mental illness that makes her incapable of parenting.
. . .
We have previously held that reformation was unlikely, and termination is appropriate where mother fails to comply with her case plans and makes only "diminutive efforts to improve her economic and domestic predicament in order to establish not only her ability but also her sincere desire to provide the most basic essentials of a safe, nurturing home environment for her children." State in the Interest of M.L., C.L. and D.L., 00-153 (La.App. 3 Cir. 5/3/00); 761 So.2d 103. That is not the case here. The record indicates that OCS found Ms. Walters increasingly cooperative and found that she was making steady improvement. Her visits with her children progressed from one hour supervised visits at the Civic Center to unsupervised, overnight visits in her home. After her release from jail, Ms. Walters advanced from living with friends to securing a home sufficient to accommodate her family comfortably. An OCS worker testified that Ms. Walters substantially complied with the requirements of her case plans. A mother's substantial compliance with the prongs of the case plans developed to reunite her with her children indicates that she has reformed. Cf. State in the Interest of C.L.R. v. Russo, 567 So.2d 703 (La.App. 3 Cir. 1990).
. . .
Based on our comprehensive examination of the record, we find that the Department did not prove all elements of Article 1015(5) by clear and convincing evidence. The Department selectively focused the trial court's attention on the most detrimental fragments of this family's history while virtually ignoring the mother's strengths and improvements. The Department proved only that at least one year has elapsed since the children were removed from Ms. Walters' custody. It was not established that she failed to comply with the requirements of her case plans or that her reformation is unlikely. Termination of parental rights is inappropriate where the Department fails to prove all three elements for termination under Article 1015(5) by clear and convincing evidence. See State in the Interest of L.L.Z., 620 So.2d 1309. For these reasons, the judgment of the trial court is reversed. We remand this case to the trial court to allow it to determine the proper placement of the children in a manner consistent with the views expressed herein.
Op. at 165, 171, 174. We granted the State's writ to determine whether the court of appeal erred in reversing the trial court's order terminating parental rights. State in the Interest of S.W., C.W., C.W., and E.W., 00-3277 (La.12/13/00), 776 So.2d. 1176.

*1232 DISCUSSION
As recognized by the United States Supreme Court, "[t]he liberty interest in this casethe interest of parents in the care, custody, and control of their childrenis perhaps the oldest of the fundamental liberty interests recognized by this Court." Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000). After reviewing its own jurisprudence, the Court stated, "[i]n light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." Id.
Recognizing this interest, this Court has held:
The State's parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. LA. CHILD. CODE art. 1001. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration.
State ex rel. J.A., 99-2905 (La.1/12/00), 752 So.2d 806, 811-12 (cites omitted).
Title X of the Children's Code governs the involuntary termination of parental rights. As applicable to this case, the grounds for termination of parental rights are:
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.
La. Children's Code Art. 1015(5). The method of proving these elements is provided in La. Children's Code Art. 1036. La. Children's Code Art. 1036(C) and (D) provide:
(C) Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one of more of the following:
(1) The parent's failure to attend court-approved scheduled visitations with the child.

*1233 (2) The parent's failure to communicate with the child.
(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
(D) Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
The State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. La. Children's Code art. 1035(A); Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that the minimum standard of proof in termination of parental rights cases in clear and convincing evidence); State ex rel. J.A., supra at 811. The State must only establish one statutory ground for termination, but the trial judge must also find that termination is in the best interest of the child. La. Children's Code art. 1039; State ex rel. J.A., supra.
"It is well-settled that an appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error or unless those findings are clearly wrong." In re A.J.F., 00-0948 (La.6/30/00), 764 So.2d 47, 61. "Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court." Id.; Rosell v. ESCO, 549 So.2d 840 (La.1989). "[I]f the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Rosell, supra at 844. "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong." Id. "In its manifest error review, it is important that the appellate court not substitute its opinion when it is the juvenile court who is in the unique position to see and hear the witnesses as they testify." In re A.J.F., supra at 62. "The trier of fact is not disadvantaged by the review of a cold record and is in a superior position to observe the nuances of demeanor evidence not revealed in a record." Id.
*1234 The trial court found that the State proved by clear and convincing evidence each element of Article 1015(5). There is no dispute that the children have been in foster care since December of 1995. Thus, the appellate court agreed with the trial court's finding that the first element of Article 1015(5), i.e., that at least one year has elapsed since the children were removed from the custody of Ms. Walters, has been met.
Regarding the second element of Article 1015(5), the trial judge found that there has been no substantial parental compliance with the case plans previously filed and approved as necessary for the safe return of the children. Proof of lack of compliance with a case plan may be evidence by one or more of the circumstances listed under Article 1036(C). The trial court found two grounds existed: that Ms. Walters failed to keep OCS informed of her whereabouts and significant changes affecting her ability to comply with the case plan; and, that Ms. Walters failed to make substantial improvement in redressing the problems preventing reunification.
In support of the factual findings of failure to keep OCS informed of her whereabouts or significant changes affecting her ability to comply with her case plans, the trial judge found that Ms. Walters routinely neglected to notify OCS of changes in her employment and living arrangements. This factual finding was supported by the testimony at trial of her case workers and the compliance reports of the case plans. The court of appeal disagreed, finding that Ms. Walters merely "delayed" in providing the necessary information to OCS, that the case plans did not articulate a time frame for compliance, and that "nothing in the record indicates that Ms. Walters unreasonably delayed in providing the information to the Department." Op. at 169. However, based on Ms. Walters pattern of failing to provide OCS with changes in living arrangements and employment, and, as late as March 1998, during the trial placement of C.D.W. in her home, of failing to inform OCS that on January 15, 1998, the District Attorney's Office had filed a petition to have C.D.W. declared a delinquent for committing criminal damage to property while in her care, and that on March 9, 1998, he was declared a delinquent and put on temporary probation. It was not until March 26, 1998, after C.D.W.'s probation officer informed Ms. Walters that she had better inform her caseworker that this had occurred or that she (the probation officer) would, that Ms. Walters informed OCS of this "significant change" affecting her ability to comply with the case plan. Clearly, the trial court's factual finding was reasonable and not manifestly erroneous.
In support of his factual finding of lack of substantial improvement in redressing the problems preventing reunification, the trial judge found that Ms. Walters was incapable of proper parenting, supervision, and discipline, her home was not safe, her pattern of employment and living was erratic, she had poor insight and judgment regarding proper care, she persistently failed to recognize her deficiencies, she had made minimal progress in parenting skills despite counseling, and during the trial placement of two children in her home, the children's emotional, academic and behavioral condition deteriorated. It is clear to this Court that all these grounds are amply supported by the record.
However, the court of appeal sharply criticized the trial court's findings and OCS's allegations in the termination proceeding, and essentially blamed all of Ms. Walters' problems on poverty. The court of appeal's view is encapsulated in the following statements:

*1235 While the Department is powerless to mandate the sterilization of poor, uneducated single women, its insidious plan of terminating the parental rights of these women, largely because of their financial, educational and marital status, compels essentially the same result. In so doing, the Department has abdicated its role as the champion for family unity and child protection and has instead become an adoption brokerage which strips poor, uneducated women of their children in order to place them with more affluent, or less impoverished families.
Op. at 168. The court of appeal even accused OCS of mischaracterizing events in such a way that was "dangerously close to deliberate deception." Id. at 169.
In discussing the findings of lack of adequate supervision, the court of appeal was of the view that the children were placed in foster care because the mother was incarcerated, and, once the incarceration ended and she did not exhibit a "pattern of incarceration," the children should have been returned to her. However, while the children were adjudicated in need of care because of neglect resulting from Ms. Walters' incarceration, the record reflects that they remained in foster care because Ms. Walters' continued to neglect the children even after she was released, as evidenced by her failure to overcome her substance abuse problem and her profound lack of supervision over the children while they were in her home, all of which placed her children in serious danger. The court of appeal found that she complied with her probationary terms, and, "after testing positive for marijuana soon after her release, she began regularly testing negative for drug use." This factual finding by the court of appeal ignores the evidence that she refused to give drug screen samples to both her probation officer and OCS on numerous occasions in 1997, 1998, and 1999[3], and that she tested positive for marijuana as late as November 23, 1998.
Further, in expressing its disagreement with the trial court's finding of lack of supervision, the court of appeal stated that Ms. Walters attended all but one of her parenting classes and had a limited opportunity to prove her parenting skills because the children were in foster care. In addressing the termination of the trial placement of S.M.W. and C.D.W. because of Ms. Walters' lack of supervision and neglect, the court expressed its view that the trial placement ended solely because of the incident where C.D.W. was adjudicated a delinquent on charges of criminal damage to property charges. The court of appeal accused OCS of distorting the dates to make it appear that the incident occurred during a weekend visitation with Ms. Walters, when it could have occurred while he was under his foster parent's supervision. However, the record is clear that the charged incident occurred between August 15-17, the dates of the weekend visit, and C.D.W. shot out windows of a house that was located across the street from Ms. Walters' trailer, with a BB gun that Ms. Walters had just purchased for him. A finding that this incident occurred while C.D.W. was in Ms. Walters' care is clearly reasonable. Further, Ms. Walters did not inform her caseworker of this until months later after basically being ordered to do so by C.D.W.'s probation officer. Finally, the record reflects OCS did not base its decision to terminate the trial placement solely on this event. OCS based its decision on *1236 the reports it was receiving from the ETC worker who was visiting the home once a week for seven weeks and who reported that Ms. Walters was not adequately supervising the children to ensure their safety, that the children told her she was using drugs, and that she would leave them to go to the store and not return until the early morning hours. OCS also based its decision to terminate the trial placement based on reports from Dr. Menou who was evaluating the children at the time and who reported that the children's behavioral and emotional problems were escalating, and that they did not feel safe in their mother's home.
Regarding Ms. Walters' instability in her housing and living arrangements, the court of appeal blamed OCS for setting "fallacious," "antithetical," "banal," and "escalating" goals that were impossible for Ms. Walters to meet, and thus found that OCS's "reliance on Ms. Walters' `unstable' housing history as part of the grounds for terminating her parental rights is egregious error." Op. at 170. We recognize that although initially Ms. Walters had trouble finding stable housing and lived mostly with different sets of friends from December of 1995, in April of 1997 she was able to secure a three-bedroom trailer that was big enough for her family and she remained there at the time of the trial. Had lack of stable housing been the only ground for termination of parental rights, we would agree that that would have been clearly unjustified; however, that was not the only reason, nor was it even a major reason in seeking termination of parental rights. The problem was not lack of stable address, it was lack of a safe and secure home for the children.
The same can be said of her employment history. In 1996 and 1997, she was fired from numerous jobs. However, from 1998 until the time of trial she generally had comparatively steady employment. The court of appeal blamed any problems Ms. Walters might have had on OCS, claiming that OCS did not assist her in securing stable employment nor did they provide her with financial resources. Again, aside from the fact that OCS is neither obligated nor equipped to secure and sustain employment for every parent under their supervision, Ms. Walters' lack of stable employment was but one of many reasons her parental rights were terminated.
Finally, the court of appeal disagreed with the trial court's findings regarding Ms. Walters' compliance with her case plans, pointing out that her caseworkers testified on cross-examination at trial that she had "substantially complied" with her case plans in that she usually only failed to meet a couple of the requirements. However, the caseworkers testified that they never felt that Ms. Walters sufficiently complied with the case plans as necessary for the safe return of the children and all the OCS reports confirm this. That is the standard of Article 1015(5), and the record certainly supports this finding.
Thus, after reviewing the record, we find that the trial court's finding that the second prong of Article 1015(5) was proven by clear and convincing evidence was reasonable and was not manifestly erroneous. The court of appeal erred in reversing this factual finding.
Lastly, the trial court found clear and convincing evidence that the third requirement of Article 1015(5) had been met, i.e., that there was no reasonable expectation of significant improvement in the parent's condition or conduct in the near future. Specifically, the trial court found, in accordance with La. Children's Code art. 1036(D), that Ms. Walters had a personality disorder which rendered her unable or incapable of exercising proper parenting without exposing the children to a substantial *1237 risk of harm, based on expert opinion and an established pattern of behavior, and, that her condition and conduct indicate that she is unable to provide an adequate home for the children based on expert opinion.
Again, the court of appeal disagreed, finding that Ms. Walters' personality traits, "such as being self-absorbed and narcissistic ... do not rise to the level of mental illness commanding a termination of parental rights." Op. at 174. Further, after noting that the evidence suggested that Ms. Walters was not improving with counseling, the court of appeal again blamed OCS for "continu[ing] to employ methods that by its own standards were failing." Id.
All three experts in this case issued reports and testified at trial. Dr. Williams' testimony was relatively the least damaging to Ms. Walters, because although he testified that she had a mental illness affecting her parenting ability that was difficult to treat and that she had made minimal progress with her treatment, he had no recommendation as to whether she should eventually be reunited with her children. He did recommend in his final report of November 23, 1996, that the children not be returned to Ms. Walters. Dr. Menou described Ms. Walters as impulsive, with histrionic and anti-social features, and felt that there was only a remote possibility of reunification because of the children's escalating behavioral difficulties and fears for their safety when they were with their mother because of her neglect and inability to care for them. She testified that it was in the best interests of the children to have Ms. Walters' parental rights terminated. Finally, Dr. Post testified that Ms. Walters has a personality disorder in that she is narcissistic, dependent, histrionic, and anti-social, all of which prevent her from parenting her children. He concluded that Ms. Walters' "chances to rehabilitate herself are just about nil" and that "the problem here is neglect."
In support of its finding that Ms. Walters did not have a "mental illness commanding a termination of parental rights," the court of appeal cited the following language from State in the Interest of J.A.:
We note that a finding of mental illness, standing alone, is insufficient grounds to warrant termination of [the parent's] rights. Instead, the mental deficiency must be related to the parenting ability. That is, if the evidence provides clear and convincing evidence that the prognosis for [the parent's] recovery in the near future is poor and there is no reasonable expectation of significant improvement in her condition in the near future, then termination is proper if it is in the best interests of the child and the additional grounds for termination have been met.
Op. at 173-174 (citing State in the Interest of J.A., supra at 814). The court of appeal distinguished J.A., in that the mother in that case suffered from chronic schizophrenia. However, the court of appeal wrongly interpreted J.A. to require a showing of a "mental illness." As the above language correctly points out, the "mental deficiency" must be related to the parenting ability, in that the prognosis for recovery is poor and there is no reasonable expectation of significant improvement in the future. Indeed, La. Children's Code art. 1036(D) speaks of "[a]ny physical or mental illness, mental deficiency, substance abuse or chemical dependency which renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm," or "[a]ny other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an *1238 adequate permanent home for the child." La. Children's Code art. 1036(D)(1)(3). Further that code article directs that these two enumerated grounds can be established by expert opinion.
Clearly, in this case, the expert opinions rendered supported the trial courts findings that the grounds enumerated in Article 1036(D)(1) and (3) existed and these findings were clearly reasonable. Again, the court of appeal erred in overturning these factual findings.
Having found that the grounds set out in Article 1015(5) were proven by clear and convincing evidence, in order to terminate Ms. Walters' parental rights, the trial court was required to find, and it did so find, that termination is in the best interest of the children. La. Children's Code art. 1037(A). The court of appeal did not address this finding, having found that OCS failed to prove all the mandatory elements of Article 1015(5). Op. at 174-175. We find that the trial court's finding that termination of parental rights is in the best interests of the children was reasonable in light of the record reviewed in its entirety.

CONCLUSION
Permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the State can take against its citizens. However, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable statutory grounds exist and are proven. In this case, the State proved by clear and convincing evidence the grounds for termination under La. Children's Code art. 1015(5) and that termination was in the best interests of the children. These findings were clearly and abundantly supported by the record and were reasonable in light of the record in its entirety. They were not clearly wrong or manifestly erroneous. The court of appeal erred by substituting its own judgment for that of the trial court.
We have no doubt that Ms. Walters clearly loves her children and they love her, and she did make improvement in several areas that were the focus of her case plans, namely in stability in employment and housing. However, a parent's love and provision of a house is not enough when that parent is unable or unwilling to provide adequate care for his or her children's physical, emotional, and mental health needs. Even after counseling, parenting education, in-home parenting assistance, substance abuse treatment, the provision of ample warning that she was in danger of losing her children, and a trial placement of two of her children in order to give her a second chance, Ms. Walters continued to abuse drugs, even in front of her children, neglected to supervise them to the extent of leaving them at home late at night alone and letting them roam unsupervised at night and not knowing where they were when ETC workers came to visit, and continued relationships with men that were potentially dangerous to her children. There comes a point when the best interests of the children must be served by terminating parental rights in order to achieve permanency and stability for the children. As we have stated, "[t]he focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parent to be terminated." State ex re. J.A., supra at 811. In addition to disregarding the manifest error rule, the court of appeal failed to focus on the best interests of the children, which the trial court found would best be *1239 served by terminating Ms. Walters' parental rights.

DECREE
For the foregoing reasons, the judgment of the court of appeal is reversed and the judgment of the trial court is reinstated.
REVERSED; JUDGMENT OF TRIAL COURT REINSTATED.
CALOGERO, C.J., concurs.
NOTES
[*] James C. Gullota, Justice Pro Tempore, sitting for Associate Justice Harry T. Lemmon.
[1] According to OCS reports, OCS was first involved with the Walters family in October of 1991 after receiving a valid complaint of confinement of C.D.W. in a closet as punishment. Family Services were provided to Ms. Walters from November, 1991 through June, 1992. In October, 1992, Ms. Walters was referred to Family Services for a valid complaint of physical abuse of E.S.W. by Dean Rodriguez, Ms. Walters' live-in boyfriend, and of lack of adequate supervision by Ms. Walters. Extensive services were provided concerning supervision, discipline, and parenting skills.
[2] La. Ch.Code art. 666 provides:

A. Following the adjudication hearing, the court shall immediately declare whether the evidence warrants a child in need of care adjudication. In exceptional circumstances, the court may take the matter under advisement for a period not to exceed ten days.
B. If the evidence warrants, the court may adjudicate the family to be in need of services and proceed to a disposition in accordance with Chapters 10 and 12 of Title VII.
C. If the court finds that the evidence does not warrant an adjudication that either the child is in need of care of the family is in need of services, it shall dismiss the petition.
[3] Ms. Walters' caseworker testified that Ms. Walters refused to submit to a drug screen requested by OCS on four occasions; in May of 1998, and in March, April, and July of 1999.