NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

JAC 21-523

STATE OF LOUISIANA

IN THE INTEREST OF

M.L.M., M.S.R., M.D.R.,

M.ST.R. & J.D.L.,JR.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 31649
HONORABLE W. MITCHELL REDD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

VAN H. KYZAR
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of D. Kent Savoie, Van H. Kyzar, and Jonathan W. Perry, Judges.

AFFIRMED.

Annette Fuller Roach
CINC Appellate Project
Roach and Roach, APLC
4315 Lake Street, Suite 4
Lake Charles, LA 70605
(337) 436-2900
COUNSEL FOR APPELLANT:
    L.A. (mother)

James Wade Smith
Attorney at Law
724 Clarence Street
Lake Charles, LA 70601
(337) 436-8424
COUNSEL FOR APPELLANT:
    L.A. (mother)

Nick Pizzolatto, Jr.
DCFS
1919 Kirkman Street
Lake Charles, LA 70601
(337) 491-2066
COUNSEL FOR APPELLEE:
    State of La., Department of Children & Family Services

Amy E. McGray
Child Advocacy Center
PO Box 3705
Lake Charles, LA 70601
(337) 491-2461
COUNSEL FOR OTHER APPELLEE:
    M.L.M. (child)
    M.S.R. (child)
    M.D.R. (child)
    M.St.R. (child)
    J.D.L., Jr. (child)

**KYZAR, Judge.**

This is an appeal from the termination of parental rights of the mother of five minor children. The parental rights of each of the four fathers of the respective children were also terminated. This appeal was filed by the mother of the minor children; none of the fathers have appealed the judgment as it relates to their parental rights. For the reasons set forth herein, we affirm the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

L.A. is the mother of five minor children, M.L.M., M.S.R., M.D.R., M.ST.R. & J.D.L., Jr.[1] M.L.M. was born September 6, 2007 to L.A. and the father, T.D.M. M.S.R. was born October 10, 2009 to L.A. and the father, M.J.R. M.D.R. and M.ST.R. were born March 5, 2012 and April 29, 2013 respectively, to L.A. and their father, D.S.R. Finally, J.D.L., Jr. was born to L.A. and his father, J.D.L., Sr. on December 14, 2014.

According to the Petition for Adoption and Termination of Parental Rights filed by the State of Louisiana, Department of Children and Family Services (DCFS) on August 16, 2018, as against L.A. and all four fathers, the children were taken into State custody on March 20, 2017, where they remained throughout the course of the proceedings. It is not contested by L.A. that this action stemmed from a physical altercation between L.A. and her then live-in boyfriend Michael Marshall in January 2017. The dispute was allegedly over the boyfriend's disciplining of J.D.L., Jr. A neighbor called the police, and L.A. was arrested after she became belligerent with investigating officers, ultimately grabbing one of the children by the hair and dragging him towards the residence. Marshall, the

---

[1] The initials of the children and their parents are used to protect the identity of the minor child. Uniform Rules—Courts of Appeal, Rules 5-1, 5-2.

1

boyfriend, left the area before the arrival of law enforcement. L.A. called relatives to take the children after she was taken into custody. L.A. testified that she was drug tested while incarcerated and tested positive for methamphetamine, resulting in the children being placed in the care of DCFS. An instanter Order was issued on March 21, 2017, and on June 13, 2017, L.A. stipulated that the children were in need of care.

On February 26, 2020, after trial, the parental rights of each of the fathers were terminated. No appeals were taken from this decision. Determination of the parental rights of L.A. was not made at that time and was reserved for a later date.

The trial as to the parental rights of L.A. commenced on March 4, 2021, recessed, and concluded on March 23, 2021, at which time the trial court found that the State had carried its burden of proof by clear and convincing evidence and rendered judgment permanently and irrevocably terminating and dissolving L.A.'s parental rights to M.L.M., M.S.R., M.D.R., M.ST.R. & J.D.L., Jr. pursuant to La.Ch.Code art. 1001, et seq, and more particularly pursuant to La.Ch.Code art. 1015 (5)(b) and (6) and art. 1036.

Custody of the children was maintained with the State of Louisiana, and the children were certified as eligible for adoption. This appeal followed wherein L.A. asserts the following assignments of error:

1) The court manifestly erred by finding clear and convincing evidence that L.A. had abandoned her children, that L.A. had not substantially complied with her case plan, that DCFS provided reasonable efforts to assist L.A. to complete her case plan, and that there was no reasonable expectation of a significant improvement in the near future.

2) The court manifestly erred by finding that the State proved by clear and convincing evidence that termination of L.A.'s parental rights was in the best interests of M.L.M., M.S.R., M.D.R., M.ST.R. & J.D.L., Jr.

2

3) The court committed manifest error and denied L.A. a fair trial when it prohibited the defense from questioning witnesses about [L.A.'s live-in boyfriend's] efforts to rehabilitate.

## DISCUSSION

*Evidentiary Ruling*

We first address L.A.'s third assignment of error arguing that the trial court committed manifest error and denied L.A. a fair trial when it prohibited the defense from questioning witnesses about Michael Marshall's efforts to rehabilitate himself such that he could regain custody of his own children.

"A trial court's rulings on evidentiary issues will not be disturbed absent a clear abuse of discretion." *State in Interest of E.O.*, 18-803, p. 8 (La.App. 3 Cir. 2/20/19), 265 So.3d 76, 83.

During the questioning of Terri Terrell, the Court Appointed Special Advocate (CASA) volunteer assigned to the case, she was asked about another case involving Michael Marshall, L.A.'s one-time boyfriend, whose children had also been removed by DCFS. Ms. Terrell was specifically asked by counsel for L.A. "[d]o we know if he completed anger management or domestic violence?" Counsel for DCFS objected to the relevancy of the question, and the trial court sustained the objection. Counsel for L.A. noted an objection to the ruling, stating only "Your Honor, I'm going to object to the Court's ruling, I think that's a relevant issue in this matter. But, nevertheless."

While this was a contemporaneous objection to the ruling, there was no statement as to the substance of the evidence or any proffered testimony on behalf of L.A. for consideration of this Court. Louisiana Code of Evidence Article 103(A)(2) provides that an "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected," and

3

"[w]hen the ruling is one excluding evidence, the substance of the evidence was made known to the court by counsel." Further, La.Code Civ.P. art. 1636 provides in part as follows:

> A. When the court rules against the admissibility of any evidence, it shall either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence.

> B. At the request of any party, the court may allow any excluded evidence to be offered, subject to cross-examination: on the record during a recess or such other time as the court shall designate; or by deposition taken before a person authorized by Article 1434 within thirty days subsequent to the exclusion of any such evidence or the completion of the trial or hearing, whichever is later. When the record is completed during a recess or other designated time, or by deposition, there will be no necessity for the requesting party to make a statement setting forth the nature of the evidence.

"It is incumbent upon the party who contends his evidence was improperly excluded to make a proffer, and if he fails to do so, he cannot contend such exclusion is error." *Ohm Lounge, L.L.C. v. Royal St. Charles Hotel, L.L.C.*, 10-1303, p. 10 (La.App. 4 Cir. 9/21/11), 75 So.3d 471, 477 (quoting *Ritter v. Exxon Mobile Corp.*, 08-1404, p. 9 (La.App. 4 Cir. 9/9/09), 20 So.3d 540, 546). Here, there was no proffer of any testimony or evidence that was sought to be admitted, nor is there a statement in the record as to the nature and content of the requested evidence by trial counsel for L.A. Thus, the issue is not adequately preserved for our review.

*L.A.'s Parental Rights*

In her first assignment of error, L.A. asserts that the court manifestly erred by finding clear and convincing evidence that L.A. had abandoned her children, that L.A. had not substantially complied with her case plan, that DCFS provided reasonable efforts to assist L.A. to complete her case plan, and that there was no reasonable expectation of a significant improvement in the near future. In

4

assignment of error number two, she argues that the trial court manifestly erred by finding that the State proved by clear and convincing evidence that termination of L.A.'s parental rights was in the best interests of M.L.M., M.S.R., M.D.R., M.ST.R. & J.D.L., Jr. We will address these assignments collectively.

In *State ex rel. A.T.*, 06-501, p. 5 (La. 7/6/06), 936 So.2d 79, 82 the supreme court discussed the law applicable to an action by the state to terminate parental rights:

> Title X of the Louisiana Children's Code governs the involuntary termination of parental rights. Permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the State can take against its citizens. However, the primary concern of the courts and the State remains to determine and insure the best interest of the child, which includes termination of parental rights if justifiable statutory grounds exist and are proven by the State. *State ex rel. S.M.W.*, 00-3277 (La.2/21/01), 781 So.2d 1223.
>
> . . . .
>
> In order to terminate parental rights, the court must find that the State has established at least one of the statutory grounds by clear and convincing evidence. *State ex rel. J.A.*, 99-2905 (La.1/12/00), 752 So.2d 806, 811 (citing La. Ch. C. Art. 1035(A); *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). Further, even upon finding that the State has met its evidentiary burden, a court still must not terminate parental rights unless it determines that to do so is in the child's best interests. La. Ch. C. Art. 1039; *State ex rel. G.J.L.*, 00-3278 (La.6/29/01), 791 So.2d 80, 85.

On appellate review of a decision in a termination of parental rights case, the findings of fact of the trial court will not be overturned unless the trial court committed manifest error or is clearly wrong. *In re A.J.F.*, 00-948 (La. 6/30/00), 764 So.2d 47.

The petition filed by DCFS requests that parental rights of L.A. to the children "be terminated under Children's Code Article 1001 et seq, and more particularly Article 1015, Sections (5)(b) and (6), and Article 1036," for the

5

reasons that, among others, she "has not provided proof of legal income sufficient income with which to support herself and her children[,]" that she "has not provided proof that she is making the court ordered parental contributions[,]" and that she "has not supplied proof of making significant contributions to the care and support of her children while they have been in Foster Care." Louisiana Children's Code Article 1015(5)(b) provides one of several grounds for the termination of parental rights as being the "[a]bandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility" by failing "to provide significant contributions to the child's care and support for any period of six consecutive months" from the "time the petition is filed[.]" Louisiana Children's Code Article 1015(6) provides for the termination of parental rights when there is sufficient proof that:

> [A]t least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Louisiana Children's Code Article 1036 states, in pertinent part:

> C. Under Article 1015(6), lack of parental compliance with a case plan may be evidenced by one or more of the following:
>
> . . . .
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

6

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

D. Under Article 1015(6), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

. . . .

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

L.A. argues that the trial court committed manifest error by finding clear and convincing evidence that L.A. had abandoned her children, that L.A. had not substantially complied with her case plan, that DCFS provided reasonable efforts to assist L.A. to complete her case plan, and that there was no reasonable expectation of a significant improvement in the near future. We disagree. In its written reasons for judgment dated March 26, 2021, the trial court found, as a matter of fact, the following:

Regarding 1015(5)(b), there is no evidence that, at the time of the filing of the petition to terminate parental rights, [L.A.] had provided any significant contributions to the children's care and

7

support for much longer than the required six (6) month period. In fact, and as set forth in detail herein, [L.A.], according to the evidence presented, made no such contributions until late 2020 or even 2021. There was no evidence or testimony of any such contributions for the period from March 20, 2017, until the Petition to Terminate Parental Rights was filed. Accordingly, the State has met its burden of proof regarding the ground set forth in La.Ch.C. Art.1015(5)(b).

Corie Young, foster care worker for DCFS, testified on March 4, 2021, and stated that she is the foster care case manager for the five children and L.A. According to Ms. Young, L.A. has paid no child support or financial support for the child at all since the children have been in the custody of DCFS. She has not shown sufficient evidence to DCFS that she can adequately provide financially for her children.

During L.A.'s testimony on March 4, 2021, the following colloquy took place between L.A. and counsel for DCFS:

Q. Do you recall your case plan requiring you to make parental contributions?

A. Yes.

Q. Do you recall how much they were?

A. It was $25 per child or something like that.

Q. There are five children?

A. Uh-huh.

Q. So, that totals $150 per month. The children will have been in custody for 48 months. Is that a fair statement?

A. Fair.

Q. My Jennings math indicates that that's about $7200. Does that sound right?

A. Yes.

Q. How much have you paid to that?

A. None.

8

Q. I'm sorry?

A. None.

According to the evidence adduced, L.A. was also court ordered to pay $500.00 per month for the support of the two oldest children. There was no evidence that any such support was paid. Concerning this issue, the following exchange occurred:

Q. Why haven't you?

A. Because the state also says on my case plan that I have to keep a house over my head for my kids to come home in. I have to keep -- I have to have everything in my house for my kids to come home. How am I to afford all of that and keep a roof over my kids' head. I also pay child support -- got taken to court for child support for the two oldest girls and I'm supposed to pay $500 a month for two kids. How am I supposed to live --

Q. When were you ordered to pay 500 per month?

A. Sometime last year.

Q. Well, let me see if I can suggest for you a time. November 5, 2019, does that sound right?

A. I don't recall the date. It could be right, sir.

Q. Well, the amounts for those two girls comes to $5700 less a few dollars. How much have you paid towards that?

A. I don't know, sir. They were taking it out of my check.

Q. But you didn't get a check.

A. I was getting a check from Dominos, sir, and they were taking it out of my check.

Q. Can you introduce a picture of what you claim was Domino's, the money you made from Domino's in two checks.

A. Can I give them a picture is what you're asking me?

Q. No. I said I showed you a picture of what you gave the worker, the only picture you gave her, you said.

9

A. Yes, sir.

Q. And it shows no child support being taken out.

A. It shows deductions be taken out or it shows no child support being taken out?

Q. It shows taxes --

A. And deductions.

Q. -- and a dollar for something. I don't know what it's for.

A. Sir, child support was taken out of my check, sir.

Q. Okay.

A. Okay.

Q. So, if the agency is saying you're $5600 behind, they're wrong?

A. I never said that I was wrong, sir.

Q. No, they were wrong.

A. I never said that they were wrong, sir. I said they were taking child support out of my check and that I no longer work there.

Q. Do you know how much you paid?

A. I do not, sir.

Based on this evidence, we find no manifest error in the trial court's findings that L.A. failed to provide significant contributions to the children's care and support for a period significantly longer than the six consecutive months required by La.Ch.Code art. 1015 prior to the filing of the 2018 petition. The trial court noted that no support was paid in 2019, and beyond, providing for a finding of abandonment pursuant to La.Ch.Code art. 1015(5)(b).

A trial court's findings of fact will not be overturned unless it committed manifest error or is clearly wrong. *In re A.J.F.*, 764 So.2d 47. The evidence presented here supports the trial court's findings of fact that L.A. did not

10

substantially comply with the court ordered case plan and that there is no reasonable expectation of significant improvement in L.A.'s condition or conduct in the near future. *See* La.Ch.Code art. 1015(6). In its reasons for judgment, the trial court stated that "[d]omestic violence is one of the primary issues in this case" and "is what led to the children being in custody[.]" The trial court found that although L.A. completed the program on anger management for substance abuse and mental health clients proscribed in her case plan, the issue "continues to be a concern" and "[t]he Court is not convinced that it has been adequately addressed." The trial court outlined some of its concerns.

> The incident which led to the children being taken into custody was related to that of domestic violence committed upon [L.A.] by her boyfriend at the time, Mike Marshall. Mr. Marshall is not one of the four different fathers of [L.A's] children. Following the [child in need of care (CINC)] adjudication, [L.A.] made minimal progress on her Case Plan, which led to the filing, on August 16, 2018, of a Petition for Certification for Adoption and Termination of Parental Rights. Following that filing, [L.A.] began to progress in her Case Plan. However, in September of 2019, more than two (2) years after this case began, - and while [L.A.] was attempting to work her Case Plan, she married [J.D.L., Sr.], the father of her youngest child. [J.D.L., Sr.] had not significantly engaged in working his Case Plan, and the State, as well as the Court, was alarmed by the sudden and unannounced nuptials. Within approximately two (2) months of the marriage, [L.A.] once again became the victim of an incident of domestic violence, this time at the hands of [J.D.L., Sr.]. At trial, there was testimony that [J.D.L., Sr.] is now in jail in the State of South Carolina on charges of murder, unrelated to this case.
>
> The marriage to and subsequent incident involving [J.D.L., Sr.] occurred during the CINC portion of this matter, and after the filing of the [termination of parental rights (TPR)] Petition. This event caused a major delay in the completion of the case. Additionally, as with many cases pending before the Court during this time, this case was significantly impacted by the COVID-19 pandemic, and then by the two (2) major hurricanes which hit Calcasieu Parish in the fall of 2020.
>
> Finally, and not without significance, is the fact that in August of 2020, during and subsequent to the hurricanes, [L.A.], by her own admission, has spent a significant amount of time in the home of Mike Marshall. He is the perpetuator of the initial domestic violence against [L.A.] which led to the filing of this case.

11

As to this element, the trial court made the following findings in its oral reasons for judgment:

> Regarding [La.Ch.Code art.] 1015(6), it is clear that, at the time of the filing of the petition, [L.A.] had not made substantial compliance with the Case Plan. Subsequently, [L.A.] did begin to make progress, however, she then made the self-admitted mistake of marrying [J.D.L., Sr.]. That decision, which caused a major delay in the completion of this case, is significant. To some extent, it supports the Court's conclusion regarding [La.Ch.Code art.] 1015(5) that her actions constituted, essentially, an abandonment of the children. That decision, combined with [L.A.'s] recent reunification with Mr. Marshall, also leads the Court to the decision that "there is no reasonable expectation of significant improvement in the parent's. conduct in the near future," considering the children's ages and need for a safe, stable, and permanent home.

We can find no manifest error with the trial court's findings considering the evidence of record herein. Ms. Young testified that DCFS is concerned about the appropriate behavioral changes being made, which is the goal of the case plan, rather than mere completion of the parts of the plan alone. While she stated that L.A. has been consistent with working on items in her case plan, the behavioral changes are not there. She stated that DCFS recognizes L.A. as still engaging in the same behavior that initially brought her children into care, including maintaining relationships with men with whom she had violent and volatile domestic relationships, such as Michael Marshall and J.D.L., Sr. Ms. Young further testified that L.A. was not forthcoming with information about her circumstances regarding her work or her relationships throughout the years her children were in DCFS custody. She found out that L.A. maintained a relationship with Mr. Marshall because of a video posted on the internet by L.A. where she was with Mr. Marshall and referred to him as her boyfriend, and also by reports from third parties. She did not know prior to L.A.'s marriage to J.D.L., Sr. that she was

12

involved again in a relationship with him, as L.A. had not provided that information to the caseworkers.

Terri Terrell also testified. She is the CASA volunteer assigned to the case for the children and had previously been the CASA advocate for the children for 3.5 years. She explained her role as being present "to advocate for the children's best interests and I am the one that is supposed to stay constant throughout the case, even if other workers come and go, or whatever. I keep constant contact with the children to know their well-being and being taken care of." She understands her primary role as a CASA volunteer is to have the best interest of the children at heart.

Ms. Terrell testified that during the course of her involvement, she located some of the videos posted by L.A. on the internet, and, through those, determined that L.A. had not been forthcoming about information as to her living situations and relationships concerning Mr. Marshall and J.D.L., Sr. She shared concerns about L.A.'s past relationships with men and her propensity to gravitate to relationships with perpetrators of domestic violence. L.A. continued her relationship with Mr. Marshall, which had led to the children's removal in the first place. She then married J.D.L., Sr., who was arrested for domestic violence towards L.A. the week after they married. Ms. Terrell further stated that L.A. herself was also charged in the incident leading to the removal of the children and that she was placed on probation for said charge of cruelty to juveniles. Following this, L.A. returned to her relationship with Mr. Marshall. J.D.L., Sr., her other paramour during this time, is now in jail in South Carolina on a murder charge. Ms. Terrell also noted that L.A.'s history was consistent with M.S.R's father, who had also been in jail and who had never had any contact with M.S.R.

13

Ms. Terrell stated that she does not feel that L.A. has made the changes in her life necessary for her to adequately take care of her children. Based on her involvement on the case she does not believe that L.A. adequately completed her case plan.

Based upon this and other testimony and evidence offered at trial, there was no manifest error in the trial court's findings. The minor children have been in the custody of the state since 2017. The evidence supports the conclusion that L.A. did not substantially comply with her case plan and that there is no reasonable expectation of significant improvement in her conduct in the near future.

Finally, we must look to whether the trial court erred in its determination that the termination of parental rights is in the children's best interests. The trial court clearly considered the best interests of the children, as can be found in its well-reasoned decision.

> The evidence and testimony at trial was that all five (5) of the minor children are currently in potential adoptive placements are and doing well. There was also testimony, mainly from the case's CASA volunteer, regarding the children's individual preference when it comes to returning to their mother or being adopted. The preference of the children is, indeed, important. However, the legal requirement for termination is "best interests" of the children. There is a difference.

> . . . .

> The Court acknowledges, [at] least as it relates to the older children, that they may believe that termination of their mother's parental rights is not what they want. The children love their mother, and that feeling is clearly mutual. Nevertheless, the final element in the TPR determination is whether termination is in the "best interests" of the children. Applying that test to the law and the facts of this case, the Court hereby finds that the termination of the parental rights of [L.A.] is in the best interests of the minor children.

We agree and find no manifest error in this decision. The trial court's finding is supported by the evidence. It is supported by the testimony of Ms.

14

Terrell, who does not feel that L.A. has made the changes in her life necessary for her to adequately take care of her children. Based on her involvement in the case, she does not believe that L.A. adequately completed her case plan. She testified that she believes it to be in the best interest of the children for parental rights to be terminated and the children be certified for adoption in their current placements.

It is supported by the testimony of Sherrie Antwine, a Baton Rouge DCFS foster care worker assigned to J.D.L., Jr., since June 2019, when he was placed in foster care in the Baton Rouge area. Ms. Antwine testified that J.D.L., Jr. is doing fine in his placement. He has been with the same foster parent the entire period of time since the state assumed custody, and the foster parent has been certified to adopt. J.D.L., Jr. refers to his foster parent as his mother. Ms. Antwine testified that it is the recommendation of her office, working along with the Calcasieu DCFS office, that J.D.L., Jr. remain where he is for adoption.

It is supported by the testimony of Ms. Young who stated that the children have been in state custody for almost four years and are happy in their present living circumstances. Each of the children are currently in certified adoptive placements and the older children are actively engaged in extra-curricular sports or other activities, activities that L.A. stated may have to be curtailed or scaled back if she were to regain custody because of her lack of financial means.

This case presents this court with an unfortunate situation for the mother of these children, but one brought on by her own bad choices and perhaps socio-economic circumstances not entirely her fault. We note that at the time of M.L.M.'s birth, L.A. was only 16 years old. At the time of M.S.R.'s birth, she was 18. At the time of M.D.R.'s birth, she was 20. At the time of M.ST.R.'s birth she was 21, and at the time of J.D.L., Jr.'s birth she was 23.

15

L.A. was the first to testify at the trial beginning March 4, 2021, having been called on direct examination by counsel for DCFS. She testified that she was currently living at a residence in Crowley, Louisiana where she had been for three months, having moved there in December 2020. She had lived with family and friends between August and December 2020. Prior to that she lived in another house in Sulphur, Louisiana for two and a half years but was forced to move from there because the house was destroyed by hurricane Laura. Before that she lived in another apartment at 2641 Napoleon Street in Sulphur for about two years with her children. It was there that the incident took place involving Michael Marshall that resulted in the children being taken into state custody. L.A. testified that on March 20, 2017, she "decided to drink alcohol that day, and I got up and my child was crying, and I thought that he whipped my child. So, I hit him, and then he hit me back. That's how it went." Neighbors called the police, resulting in her arrest. The children witnessed the domestic violence event between L.A. and Marshall. When asked if that was the reason the children were taken into state custody, she stated, "[t]hat's the reason why the children got put with family members, but whenever I got out of jail they drug tested me and I failed for a drug test, so they put my kids in the State." When asked what she tested positive for she stated "[m]ethamphetamines." In the almost four years since the children have been in state custody at the time of trial, she had not been able to regain custody of any of the five children. L.A. testified that she was only married to one of the children's fathers, noting that she had married J.D.L., Sr., the father of her youngest child, on September 13, 2019. At some point prior to the March 20, 2017 incident involving Mr. Marshall, L.A. stated that she had spent time in jail for aiding and abetting a fugitive, which she said was J.D.L., Sr.

16

When asked if she had lived with Michael Marshall at any time after the incident leading to the removal of the children, and if so where did he live, she became defensive and stated "[t]hat's his business. Do I have to tell you that? I mean, it's in Sulphur, but that's Michael – I'm [L.A.]. I'm not supposed to speak on Michael." She also stated that while J.D.L., Sr. stayed at her house after they married, he only stayed for a few nights at a time. She claimed that he did not live there because she was on Section 8 housing assistance and he was not allowed to live with her. She admitted that on November 26, 2019, she filed for a protective order against J.D.L., Sr. The protective order was applied for because J.D.L., Sr. had hit her. She admitted that she had been injured as a result of the incident and that pictures of her injuries were taken, but could not recall what her injuries were. When the hearing on the protective order was held, however, she did not show up. When asked why she did not show up, she sated "I was working and it slipped my mind, and I didn't remember, sir. I don't have a reason."

Considering the entirety of the record, we find no error in the judgment of the trial court. There is more than sufficient clear and convincing evidence of multiple grounds for the termination of parental rights as required by La.Ch.Code art. 1015. The finding that such is in the best interest of the children is not clearly wrong, or manifestly erroneous.

## DECREE

For the foregoing reasons, the judgment of the trial court terminating the parental rights of L.A. to the children M.L.M., M.S.R., M.D.R., M.ST.R. & J.D.L., Jr. and certifying the children as eligible for adoption is affirmed.

**AFFIRMED.**

17